1

2

3

4

5       IN THE UNITED STATES DISTRICT COURT

6       FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    MALIK ALI MUHAMMAD,                      )    No. C 09-4140 JSW (PR)
                                              )
9              Petitioner,                    )
                                              )    **ORDER DENYING PETITION FOR**
10       vs.                                  )    **WRIT OF HABEAS CORPUS AND**
                                              )    **CERTIFICATE OF APPEALABILITY**
11   MATTHEW M. MARTEL, Warden,               )
                                              )
12             Respondent.                    )
                                              )
13   _____         )

14

15                        **INTRODUCTION**

16        This is a habeas corpus case filed *pro se* by a state prisoner pursuant to 28 U.S.C.

17   § 2254.  The Court ordered Respondent to show cause why the writ should not be

18   granted.  Respondent filed an answer and a memorandum of points and authorities in

19   support, and has lodged exhibits with the Court.  Petitioner responded with a traverse.

20   For the reasons set out below, the petition is DENIED.

21                    **PROCEDURAL BACKGROUND**

22           On April 20, 2005, a jury convicted Petitioner of four counts of stalking

23   (Cal. Penal Code § 646.9, subds. (a), (b), (c)(1), & (c)(2) — counts 1–4), and

24   misdemeanor criminal contempt (Cal. Penal Code § 166, subd. (a)(4) — count 5), for acts

25   committed against Ivory Jean Hart between December 2003 and December 2004.  The

26   trial court sentenced Petitioner to a total prison term of 10 years:  the upper term of five

27   years on count 4, doubled for an admitted prior serious felony conviction pursuant to the

28   Three Strikes law (Cal. Penal Code §§ 1170.12, subds. (a)–(d); 667, subds. (b)–(i)).

Punishment on all other counts was stayed pursuant to Cal. Penal Code § 654.

Petitioner appealed the conviction, arguing that Cal. Penal Code § 646.9(a), (b), (c)(1) and (c)(2) do not describe separate offenses but rather describe alternate punishments for the single offense of stalking, and that he therefore was erroneously convicted of counts 1, 2, and 3.  He also argued that the trial court had committed judicial misconduct, instructional error, and sentencing error.  On November 30, 2007, in a reasoned opinion, the California Court of Appeal vacated Petitioner's convictions on counts 1, 2, and 3, finding that these counts were alternate punishments for the single offense of stalking.  Doc. #9, Exh. 9.  The California Court of Appeal affirmed the conviction and sentence imposed on counts 4 and 5, and rejected Petitioner's remaining claims.  *Id.*  On March 19, 2008, the California Supreme Court denied Petitioner's petition for review.  Doc. #9, Exh. 11.

On November 21, 2008, Petitioner filed a petition for a writ of habeas corpus in the Marin County Superior Court, challenging his conviction on the same grounds as first raised in his direct appeal, and raising for the first time the following additional grounds for relief:  insufficiency of the evidence; First Amendment violation; prosecutorial misconduct; erroneous admission of evidence regarding Petitioner's religious beliefs; disproportionate sentence in violation of the Eighth Amendment; ineffective assistance of trial counsel; and ineffective assistance of appellate counsel for failure to raise these claims on direct appeal.  Doc. #9, Exh. 13 at 6.  On December 10, 2008, the state trial court denied his petition.  Doc. #1 at 58.

On December 29, 2008, Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal, which denied the petition on January 8, 2009 as follows: "The petition for writ of habeas corpus is denied.  *(In re Waltreus* (1965) 62 Cal. 2d. 218, 225; *In re Dixon* (1953) 41 Cal. 2d 756, 759; *In re Lindley* (1947) 29 Cal. 2d 709, 723; *In re Swain* (1949) 34 Cal. 2d 300, 303–304; *In re Fields* (1990) 51 Cal. 3d 1063, 1071; *People v. Duvall* (1995) 9 Cal. 4th 464, 474.)"  Doc. #1 at 59.  No opinion or other

2

explanation accompanied these citations. *Id.* On February 20, 2009, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, which was summarily denied on July 29, 2009. Doc. #1 at 60. Petitioner subsequently filed this instant petition for a writ of habeas corpus on September 8, 2009.

Petitioner raises the following ten claims in his Petition: (1) judicial misconduct; (2) instructional error; (3) sentencing error; (4) insufficiency of the evidence; (5) violation of his First Amendment right to free speech; (6) prosecutorial misconduct; (7) violation of his First Amendment right to free exercise of religion; (8) disproportionate sentence in violation of the Eighth Amendment; (9) ineffective assistance of trial counsel; and (10) ineffective assistance of appellate counsel.

## FACTUAL BACKGROUND

The Court has reviewed the record in this case, as well as the California Court of Appeal's summary of the evidence in its opinion on direct appeal. The state court's summary is consistent with the Court's own review of the record. Accordingly, the Court has quoted the state court opinion below to provide an initial factual overview.[1]

**Background**

In September 2001, [Petitioner] and the victim, Ivory Jean Hart,

---

[1]On federal habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e) (1). *See also Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007) ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'") (citing Section 2254(e)(1)); *Pollard v. Galaza*, 290 F.3d 1030, 1033, 1035 (9th Cir. 2002) (statutory presumption of correctness applies to findings by both trial courts and appellate courts). The Section 2254(e)(1) presumption has not been shown to be inapplicable to the state appellate court's description of the evidence presented at Petitioner's trial. Accordingly, in the above summary, the Court has quoted the pertinent portions of the state court's decision. *See Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) (relying on and presuming the correctness of the state appellate court's summary of the evidence at trial, when such findings had not been shown to be erroneous under Section 2254(e) (1)).

began a dating relationship that she ended six or seven months later.  Hart was employed as a financial center manager and served as a vice president of Citibank (the bank).

In April 2003, [Petitioner] was convicted of stalking (§ 646.9(a)) and making terrorist threats (§ 422) stemming from acts[2] committed against Hart between September and October 2002. In August 2003, [Petitioner] was placed on probation and a 10-year restraining order issued against him, prohibiting his contact with Hart and her employer.

**Current Offenses**

In December 2003, Hart received over 50 hang-up phone calls.  On December 17, she received two calls to her cell phone from the 916 area code, and the next day received a call on her home phone from [Petitioner's] Sacramento phone number.

On January 7, 2004, [Petitioner] called the bank's ethics hotline to report that Hart had been smoking marijuana, using nonprescription sleeping pills and Vicodin and had marijuana delivered to the bank.  On January 13, [Petitioner] again wrote to the bank regarding Hart's "habitual narcotics usage and addiction."  On January 16, he wrote to the bank attaching a warning to the bank's customers of Hart's habitual marijuana use and he threatened to publish the warning to the bank's customers on March 1.  On January 22, he wrote to the bank "strongly" suggesting that Hart undergo drug testing and a polygraph examination so she could "come to grips with her problem."  On February 4, in response to a letter from the bank informing [Petitioner] that his allegations were untrue and would no longer be investigated, [Petitioner] wrote the bank stating he would distribute the aforementioned warning.  On February 6, [Petitioner] wrote to the bank's chief executive officer (CEO) in New York regarding Hart's drug use.  In late February, he was arrested and remained in custody until his release on January 13, 2005.

On May 24, 2004, [Petitioner] again wrote to the CEO attaching photos of Hart and stating he was facing imprisonment as a result of his prior attempt to provide information to the bank.  On that same date, [Petitioner] was sentenced to prison for a violation of the probation imposed following his convictions for stalking and making terrorist threats in April 2003.  The following day (May 25), [Petitioner] left a telephone voice mail message at the Alameda County prosecutor's office stating that for "the rest of [his] life" [Petitioner] would continue to publicize that Hart is a marijuana addict, but he would never use any violence or threats of violence.

On May 27, 2004, [Petitioner] again wrote to the bank's CEO stating that all future communications regarding Hart's criminal behavior would be sent directly to bank customers and the media.  On December 7, 2004, [Petitioner] wrote to the Alameda County District Attorney's office

---

[2][Petitioner's] acts consisted of leaving Hart threatening telephone messages.

summarizing [Petitioner's] concerns about the judicial system and Hart's use of illegal narcotics.  On the same day, [Petitioner] again wrote to the CEO stating he intended to expose any attempts by the bank to conceal evidence of Hart's criminal conduct, attaching his letter to the district attorney's office.

[Petitioner] was an inmate at San Quentin prison from June 7, 2004, until he was paroled in January 2005.  Prior to being paroled, [Petitioner] objected to the parole condition prohibiting his contact with Hart and her family, friends and employer, but nonetheless signed an agreement to his parole conditions.

Hart testified that after each of [Petitioner's] threats, she was fearful that he would follow through on them and she would lose her job.  She was also fearful that he would kill her.  She said she had trouble sleeping, was seeing a psychotherapist and taking antidepressant medication.  A San Quentin correctional counselor testified that when Hart was informed of [Petitioner's] upcoming parole, she was "extremely" fearful and anxious.

### *The Defense*

[Petitioner] testified he had been an Oakland police officer, after which he went to law school.  He worked as a deputy district attorney and then practiced as a defense attorney until 1999.  He was eventually disbarred.  Thereafter he taught at "Cal State Hayward."

[Petitioner] admitted making all the telephone calls to Hart except for the December 2002 call.  He said he made the calls to Hart when he was drinking and did not intend to frighten, harm or kill her.  He said he merely intended to unleash his anger and frustration and was now ashamed and embarrassed for leaving the messages.  [Petitioner] also admitted writing the letters to the bank out of concern for Hart's drug use and because the district attorney's office would not investigate.

[Petitioner] said after being placed on probation on August 14, 2003, he was never provided with the terms and conditions of his probation, and did not receive them until mid-September.  He said his calls and letters to the district attorney's office were to clarify the difference between the protective order issued against him and the court's minute order, and to express frustration "for the way that this entire matter had been handled." He said he objected to the parole conditions because he could not contact or sue the bank.

Doc. 9, Exh. 9 at 2–4, footnotes in original, renumbered.

### **STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–409 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Section 2254(d) applies not just to reasoned opinions, but also to summary rulings. *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412–413. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

In *Ylst v. Nunnemaker*, the Supreme Court held that where the last reasoned opinion on a claim expressly imposes a procedural bar, it should be presumed that a later

6

decision summarily rejecting the claim did not silently disregard the bar and consider the merits. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801–06 (1991). In *Ylst*, the petitioner appealed his conviction on various grounds, including claiming for the first time that certain testimony was inadmissible because it had been elicited in an interview which had not been preceded by a *Miranda* warning, *see Miranda v. Arizona*, 384 U.S. 436 (1966). The state appellate court affirmed the conviction and rejected the *Miranda* claim as procedurally barred under *People v. Bennett,* 60 Cal. App. 3d 112, 116 (1976) which requires *Miranda* claims to be raised first at trial. The California Supreme Court denied petitioner's petition for review. The petitioner then filed a petition for collateral relief in the state superior court, the state appellate court, and the California Supreme Court. The California Supreme Court denied the petition, citing to *In re Swain*, 34 Cal. 2d 300, 304 (1949), and *In re Waltreus*, 62 Cal. 2d 218, 225 (1965). No opinion or other explanation accompanied these citations. Petitioner proceeded to file a habeas petition in the federal district court, which was denied for failure to exhaust state remedies. Petitioner then filed a second habeas petition with the California Supreme Court, which was denied without opinion or case citation. In this situation, the Supreme Court found that the last reasoned state court opinion addressing the *Miranda* claim was the state appellate court decision affirming the petitioner's conviction.

Here, with respect to the first three claims (judicial misconduct, instructional error, and sentencing error), the last reasoned opinion was the state appellate court's denial of these claims on appeal. Doc. #9, Exh. 9. Although these claims were raised again in Petitioner's state habeas petitions, the state appellate court rejected these claims pursuant to the state law *Waltreus* rule, which provides that any issue that was actually raised and rejected on appeal cannot be renewed in a state habeas petition. *In re Waltreus*, 62 Cal. 3d at 225; *see also Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996). Pursuant to *Ylst*, the Court looks through a *Waltreus* denial to the last reasoned state court opinion on these three claims, specifically the November 30, 2007 opinion issued by the state appellate

court, and accords this opinion the deference required by Section 2254(d).  *See Ylst*, 501

U.S. at 803.

With respect to the remaining seven claims, the state court provided no reasoned

explanation of its decision on Petitioner's federal claims.  The last reasoned opinion

regarding these claims was the state appellate court's denial of the habeas petition.  *Id.*

Because the state courts issued no reasoned opinions, the Court must conduct an

independent review of the record, to determine whether the state court decision was

contrary to, or an unreasonable application of, clearly established Supreme Court law.

*See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) *overruled in part by Lockyer v.*

*Andrade*, 538 U.S. 63, 74–77 (2003); *see also Plascencia v. Alameida*, 467 F.3d 1190,

1198 (9th Cir. 2006).

## DISCUSSION

### I.      Claim 1 – Judicial Misconduct

Petitioner argues that the trial court committed judicial misconduct by

(1) commenting on Hart's demeanor in a way that impermissibly vouched for her

credibility, (2) undermining Petitioner's defense by intervening as an adversary in

Petitioner's examination, and (3) improperly buttressing the prosecution case by

interrupting examination of key prosecution witness to elicit testimony favorable to the

prosecution.  Doc. #1 at 9–17.  In considering this claim, the Court looks to the reasoned

opinion issued by the state appellate court, *see Ylst*, 501 U.S. at 803 wherein the state

court rejected the judicial misconduct claims as procedurally barred by Petitioner's failure

to object at trial and meritless:

A.      Claim that Court Vouched for Hart

Hart was the first prosecution witness.  Early in her direct examination,
after Hart identified [Petitioner] in the courtroom and explained when and how
she met him, the following colloquy occurred:

"[The Prosecutor]:  Ms. Hart, how do you feel right now being in the
courtroom?

1    "The Court: She doesn't feel good.  She's obviously a competent business person and runs her own operation, and she's very uncomfortable here.  Visibly so.  Thank you.

2

3    [The Prosecutor]:  "Thank you, your Honor."

4    [Petitioner] argues that the court's comment was "utterly improper" because it conveyed to the jury that it viewed Hart as a "responsible and competent person in a difficult situation," and the jury should view her that way too, as well as credible.  He also argues that the court's comment was unsupported by the evidence and implied she was so uncomfortable that the prosecutor's question as to how she felt was unnecessary.  He asserts the comment withdrew material evidence from the jury's consideration and deprived the jury of the opportunity to perceive Hart answer the question.

5

6

7

8    "'The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered.'  [Citation.]  To this end, 'the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.'  [Citation.]  The trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence.  [Citation.]  As provided by section 1044, it is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.'  However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the [Petitioner].'  [Citation.]  [¶]  Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.'  [Citation.]"  (People v. Sturm (2006) 37 Cal.4th 1218, 1237–1238.)

9

10

11

12

13

14

15

16

17    In general, claims of judicial misconduct are not preserved for appellate review where no objection to the claimed misconduct was lodged at trial.  However, failure to object does not preclude review when an objection and admonition could not cure the prejudice caused by the misconduct, or when an objection would have been futile.  (People v. Sturm, supra, 37 Cal.4th at p. 1237.)

18

19

20    Despite [Petitioner's] unsupported assertion that an objection to the court's comment would have been futile, we conclude this claim of judicial misconduct is barred by [Petitioner's] failure to object.  The comment by the court was made within the first few minutes of the prosecutor's direct examination of Hart, the first witness for the prosecution.  [Petitioner] points to nothing in the record at the time of the court's comment or prior thereto to indicate any hostility between the court and defense counsel or bias by the court against him.

21

22

23

24

25    We also reject [Petitioner's] assertion that defense counsel's failure to object to the court's comment constituted ineffective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to the defendant such that it "'so undermined

26

27

28

9

the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (People v. Andrade (2000) 79 Cal.App.4th 651, 659–660.) We conclude that counsel's failure to object could reasonably be attributed to a perception that the court's comment was not improper. The thrust of the defense was that [Petitioner's] conduct in the charged offenses was not harassing, and he did not specifically intend to cause Hart to be fearful. Defense counsel argued that [Petitioner's] letters and phone calls were directed to the bank not Hart, and no legally enforceable order prohibited him from doing so. Hart's position at the bank was not at issue nor was her credibility. Consequently, defense counsel could reasonably conclude that the court's comment was merely a comment on Hart's visibly uncomfortable demeanor and was not intended as a comment on her credibility.

B.     Claim that Court Improperly Intervened in [Petitioner's] Examination

[Petitioner] next contends the court twice improperly undermined his defense by intervening as an adversary during his direct examination. After [Petitioner] explained he had not received the terms and conditions of his probation upon his release from custody in August 2003, the following colloquy occurred:

"[Defense Counsel]: Sir, what document did you rely on to help you guide your conduct on probation?

"[Petitioner]: This one. It is the only one I had.

"[Defense Counsel]: Does that document prohibit you from writing letters to Ms. Hart's employer?

"The Court: The document will speak for itself.

[Petitioner] argues that the court's comment "stopped him from explaining the terms he believed bound him." Aside from [Petitioner's] waiver by failing to object below, the argument lacks merit. The court's comment was a proper statement of the "secondary evidence rule," i.e., if a litigant seeks to introduce evidence of the words contained in a document, he must introduce the document itself, not a verbal recollection of its terms. (See Meadows v. Lee (1985) 175 Cal.App.3d 475, 490 (dis. opn. of Johnson, J.).)

Thereafter, while [Petitioner] was testifying about the 10-year protective order he received, the following colloquy occurred:

"[Petitioner]: Because there were serious contradictions. I had terms and conditions of probation from my probation officer. I had a protective order and I also had a minute order from August 14, 2003. The protective order reflected the same as the terms and conditions of my probation. The minute order reflected differently.

"[Defense Counsel]: Does one document say it takes precedence over the other?

"[Petitioner]: Protective order says it takes precedence over any conflicting court order.

10

"[Defense Counsel]:  So when you received that, did you then now rely on the 10-year protective order?

"The Court:  What does that language have to do with your question? He's got a memo from a probation officer and a court order and you are comparing the two.  He says the language says it takes precedence over any other court order.

"[Defense Counsel]: Yes.

"The Court: Is there something about the probation document that makes it a court order?

"[Defense Counsel]:  No.

"The Court:  So pursue that, if you want to, but at the moment there is nothing that relates to the relationship between that and the other document.

"[Defense Counsel]:  Correct.

"The Court:  So the thing that was sent by [Inspector Corey] White says it took precedence over any other court order?

"[Defense Counsel]:  That's correct.

"The Court:  Which doesn't bear any relationship to the probation document?

"[Defense Counsel]:  That's correct.

[Petitioner] argues that the court's questions and comment made in front of the jury were an "argumentative, adversarial dismissal of the defense theory" in violation of the court's duty of impartiality.  He also argues the court's questioning was meant to demonstrate that he knowingly and willfully violated a court order.  He also suggests if the court wanted to discuss the relevance of defense counsel's line of questioning it could have done so in a sidebar conference or outside the presence of the jury.

Contrary to [Petitioner's] assertion, the court's questions and comment were neither argumentative nor inappropriate.  The court's questions and comment were intended to focus defense counsel's examination on [Petitioner's] testimony that the protective order took precedence over any other court order, and keep the questions from straying to collateral matters.

. . .

C.     Claim that Court Improperly Intervened to Elicit Testimony Favorable to the Prosecution

[Petitioner] contends that on two occasions the court intervened in the examination of prosecution witnesses to buttress the prosecution's case. Once again, the argument lacks merit.

11

During defense counsel's cross-examination of Hart as to whether [Petitioner's] call caused her concern about losing her job, the following colloquy occurred:

"The Court:  Do you remember being concerned about your employment up to the time of testifying at the trial in Alameda?

"[Hart]:  There was one specific call that he made when he said it was between me, you and Cal Fed.

"The Court: Do you remember when that happened?  Before the trial?

"[Hart]: It was before the trial.

"[Defense Counsel]: Were you concerned about your job at this time?

"[Hart]: I was concerned about him going to my job.  I wasn't too much concerned about losing my job because I have had my job for a long time.

"The Court: Were you concerned about some form of employment consequence because of his contact with your employer?

"[Hart]: Yes, that's a possibility.

"The Court:  What kind of complication or consequence did you have concern for as of the time of the trial?

"[Hart]: His threats.

"The Court: What did you think might be the upshot of problems like that at work?

"[Hart]: His accusations, the fact that he was coming in and out of the job harassing me.  I think they would look at that as a risk to not only customers' lives, but mine and employees.

[Petitioner] argues that the court's partisan intervening questions "fed. . . Hart leading questions to establish one of the essential elements of the [charged] offense."  However, [Petitioner] does not specify what element of the crime of stalking the court's questions helped to establish.  The elements of the crime of stalking are (1) repeatedly following or harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family. (§ 646.9(a).)  In addition, the court's questions were within the limits of its duty to bring out facts relevant to the jury's determination and were not leading, partisan or improper.

[Petitioner] also argues that the court improperly intervened in the prosecutor's direct examination of Citibank employee Pamela Austin to elicit evidence favorable to the prosecution.  During the course of Austin's testimony that on January 12, 2004, she called [Petitioner] and told him his complaint had been received and the issues he reported had been previously investigated and found to be without merit, the following colloquy occurred:

12

1 "[The Prosecutor]: What was his reaction to you telling him that you investigated the matter and that these allegations are unfounded?

2

3 "[Austin]: My memory isn't very clear about that.  I remember that he continued to object, but beyond that, I don't remember.

4 "[The Prosecutor]: The following day, January 13, 2004, did Citibank receive voice mail messages from the [Petitioner] concerning Ms. Hart?

5

6 "[Austin]: Yes.

7 "[The Prosecutor]: Can you describe those to the jury?

8 "[Austin]: It was a message to me asking that I call him.

9 "[The Prosecutor]: Were you aware of any other message that [Petitioner] left at Citibank that same day?

10 "[Austin]: A call was also left with a woman that works with me making allegations against [Hart].

11

12 "The Court: As for the January 12th telephone call, you said he continued to object and you don't remember much about the substance of the conversation.  Was it a calm and pleasant conversation?

13 "[Austin]: It was an intense conversation.  He was very insistent.

14

15 [Petitioner] argues that the court's question suggests that the court was unsatisfied with Austin's "neutral" description of the call she received from [Petitioner] and therefore asked a leading question designed to elicit testimony damaging to the defense.  Once again, we see no impropriety in the court's question.  "'The duty of a trial judge, particularly in criminal cases, is more than that of an umpire; and though his power to examine the witnesses should be exercised with discretion and in such a way as not to prejudice the rights of the prosecution or the accused, still he is not compelled to sit quietly by and see one wrongfully acquitted or unjustly punished when a few questions asked from the bench might elicit the truth.  It is his primary duty to see that justice is done both to the accused and to the people.  He is, moreover, in a better position than the reviewing court to know when the circumstances warrant or require the interrogation of witnesses from the bench.' [Citation.]" (People v. Raviart (2001) 93 Cal.App.4th 258, 272.)  The court's question indicates only an intent to ferret out relevant facts, not to damage the defense.  Thus, no misconduct is shown.

16

17

18

19

20

21

22

23 Doc. 9, Exh. 9 at 12–18.[3]

24

25 [3]This portion of the opinion of the California Court of Appeal was not published in official reports.  California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing and relying on opinions not certified for publication, except as specified in rule 8.1115(b), as is the case here.

26

27

28

13

## A.    Procedural Default

Although judicial misconduct implicates the right to federal due process, for reasons of comity and federalism, federal court review of a state court decision regarding judicial misconduct is barred if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991); *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011). To be "independent," the state law basis for the decision must not be interwoven with federal law. *Harris v. Reed*, 489 U.S. 255, 265 (1989); *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000). To be "adequate," the procedural rule must be consistently and regularly applied by the state courts. *Johnson v. Mississippi*, 486 U.S. 578, 588–89 (1988). The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine. *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994).

Under California law, Petitioner's judicial misconduct claim is not preserved for appellate review unless trial counsel made a timely objection to the alleged misconduct. *See People v. Snow*, 30 Cal. 4th 43, 77–78 (2003). The Ninth Circuit has held that the contemporaneous objection rule constitutes a valid procedural bar. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004); *Vansickel v. White*, 166 F.3d 953, 957–58 (9th Cir. 1999). Accordingly, the contemporaneous objection rule is a sufficient basis for the state court's judgment and federal habeas review is barred. *See Harris*, 489 U.S. at 264 n.10 ("By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

## B.    Cause and Prejudice

Petitioner argues that even if his judicial misconduct claim was procedurally defaulted, federal habeas review is still appropriate because it would have been futile for

1    trial counsel to object or, in the alternative, trial counsel was ineffective when he failed to

2    object to the alleged instances of judicial misconduct and preserve the issue for appellate

3    review.

4            Where a petitioner can demonstrate either cause for the procedural default and

5    actual prejudice as a result of the alleged violation of federal law, or that failure to

6    consider the claims will result in a fundamental miscarriage of justice, a federal court may

7    consider claims that were defaulted pursuant to an independent and adequate state

8    procedural rule. *Coleman*, 501 U.S. at 750. The cause standard requires the petitioner to

9    show that "'some objective factor external to the defense impeded counsel's efforts' to

10   raise the claim." *McClesky v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v. Carrier*,

11   477 U.S. 478, 488 (1986)). A petitioner must also show actual prejudice resulting from

12   the errors of which he complains. *See McCleskey*, 499 U.S. at 494. He must show not

13   merely that the errors at his trial created a possibility of prejudice, but that they "worked

14   to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of

15   constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis

16   in original); *see also White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989).

17           A petitioner may show cause by establishing constitutionally ineffective assistance

18   of counsel. *See McClesky*, 499 U.S. at 494; *Carrier*, 477 U.S. at 486–88. In order to

19   prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish

20   (1) that counsel's performance was deficient, i.e., that it fell below an "objective standard

21   of reasonableness" under prevailing professional norms and (2) that he was prejudiced by

22   counsel's deficient performance, i.e., that "there is a reasonable probability that, but for

23   counsel's unprofessional errors, the result of the proceeding would have been different."

24   *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A reasonable probability is a

25   probability sufficient to undermine confidence in the outcome. *Id.* Federal courts

26   reviewing ineffective assistance of counsel claims under Section 2254 must be "doubly"

27   deferential. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410–11 (2011); *Harrington*, 131

28

S. Ct. at 788 (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same).  The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA."  *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 131 S. Ct. at 788.

This Court cannot say that the state appellate court's rejection of Petitioner's argument that the procedural default was excused was unreasonable under Section 2254(d).  First, Petitioner's argument that it would have been futile for trial counsel to object does not satisfy the cause standard.  *Engle v. Isaac*, 456 U.S. 107, 130 (1982) (claim of futility of presenting objection to state courts will not constitute cause for failure to object at trial).  Second, Petitioner failed to establish ineffective assistance of trial counsel in this instance.  The state appellate court reasonably concluded that trial counsel's failure to object was a reasonable trial strategy.  *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable).  With regard to the trial court's comment on Hart's demeanor, the state appellate court noted that trial counsel's failure to object could have been based upon a reasonable assumption that the comment was not improper since the defense theory focused on Petitioner's intent rather than challenging Hart's credibility.  *See* Doc. #1 at 10 and Reporter's Transcript ("RT")[4], volume 6 at 447.  In the closing statement, defense counsel emphasized that

_____

[4]The Reporter's Transcript of the jury trial is lodged with the Court by the Attorney General as Exhibit 2 to Respondent's Answer (Doc. #9).

Hart's fear was not an issue, 6 RT 440, and argued that Petitioner's focus had shifted from Hart to addressing an injustice with Citibank, *id.* at 447.  Similarly, failure to object to the trial court's questions clarifying that the court's minute order took precedence over the probation document was a reasonable decision since the trial court's questions properly stated the "secondary evidence rule," and clarified that a probation document is not a court order.  Nor was it ineffective assistance of counsel when trial counsel failed to object to the trial court's intervention in the cross-examination of Hart and prosecution witness Pam Austin.  The state appellate court reasonably found that the trial court's questions were intended to elicit relevant facts.  Petitioner has therefore failed to show cause to excuse his procedural default of his judicial misconduct claim, and federal habeas review is unavailable for this claim.  *Harrington*, 131 S. Ct. at 788 (noting that establishing that a state court's application of *Strickland* was unreasonable under Section 2254(d) is even more difficult than establishing unreasonableness under *Strickland* alone).

## II.   Claim 2 – Instructional Error

Petitioner claims that his due process right to a fair trial was violated by the trial court's pre-instruction statement during voir dire which he alleges unconstitutionally lessened the prosecutor's burden of proof.  The state appellate court summarized the relevant facts and rejected the claim as procedurally barred:

> During jury selection the trial court informed the prospective jurors of the charges against [Petitioner] and stated: "I want to hasten to point out that you probably all remember from your seventh grade civics course anyway, we are not going to infer or assume that because [Petitioner] is charged with something here, or there is an allegation of some prior conviction, that he is more likely than not to be guilty of anything, including spitting on the sidewalk, because it just isn't so.  [¶]  You, I, and everybody else in this county, citizen or no, is entitled to the protection of our Constitution, and it provides for a presumption of innocence.  So if we are ever charged with a public offense, we are entitled to that presumption of innocence until it is proved beyond a reasonable doubt that we have broken the law.  [¶]  So we are not going to infer or assume from the fact that [Petitioner] is charged with some things, or may have been arrested at some point, or is here to have a trial, that he is any more likely than not to be guilty of anything, because that just wouldn't be fair, reasonable, or consistent with our rule of law here.  So keep

that in mind.  [¶]  *I also want to be sure that nobody jumps to the conclusion or infers that because we are here to have a trial, the prosecution is not capable of proving the charges beyond a reasonable doubt.  That wouldn't be a fair inference either.*"  (Italics added.)[5]

Thereafter unreported voir dire continued and the following day the jurors selected were sworn.

[Petitioner] contends that the above italicized statement by the court diluted the presumption of innocence and lessened the prosecution's burden of proving his guilt beyond a reasonable doubt, in violation of his rights to due process under the Fourteenth Amendment.  [Petitioner's] contentions fail for several reasons.

[Petitioner's] failure to object to the court's preinstruction constitutes a waiver of his claim on appeal.  "[Petitioner's] failure to object at trial . . . particularly where (as here) such action would have permitted the court to clarify any possible misunderstanding resulting from the comments, bars his claim of error on appeal.  [Citation.]"  (*People v. Mitchum* (1992) 1 Cal.4th 1027, 1053.)  "'The purpose of the rule requiring timely objection is to give the trial court the opportunity to cure any error, if possible, by an admonition to the jury.'  [Citation.]"  (*People v. Sanders* (1995) 11 Cal. 4th 475, 531.)

Doc. 9, Exh. 9, at 19–20, footnote in original, renumbered.

To obtain federal habeas relief for a erroneous jury instruction, a petitioner must show that the instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *Frady*, 456 U.S. at 169 (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.

---

[5][Petitioner] concedes that at the conclusion of the case the court properly instructed the jury on the presumption of innocence pursuant to CALJIC No. 2.90.

18

1988); *see, e.g.*, *Middleton v. McNeil*, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

However, as discussed in Section I *infra*, the contemporaneous objection rule constitutes a valid procedural bar which precludes federal habeas review. *See Paulino*, 371 F.3d at 1093 (instructional error claim procedurally barred by trial counsel's failure to contemporaneously object). Petitioner does not address his procedural default. Nor do his conclusory allegations of injustice satisfy the miscarriage of justice standard. *See Wildman v. Johnson*, 261 F.3d 832, 842–43 (9th Cir. 2001) (finding that since petitioner failed to challenge the facts underlying his convictions, his claim of manifest injustice was without merit and his admitted procedural defaults not excusable). Federal habeas review is therefore barred by an independent and adequate state ground. *See Coleman*, 501 U.S. at 729–30.

## III.    Claim 3 – Sentencing Error

Petitioner argues that the trial court's imposition of an upper term sentence on count 4 (stalking with a prior stalking felony conviction) pursuant to Cal. Penal Code § 646.9(c)(2) and doubled pursuant to the Three Strikes Law (Cal. Penal Code §§ 1170.12, subds. (a)-(d); 667, subds. (b)-(i)) for a prior conviction, for a total term of ten years violated his Sixth Amendment right to a jury on any factor that increases the penalty for a crime beyond the prescribed statutory maximum. Petitioner argues that the court improperly imposed the upper five-year term based upon the following aggravating factors which had not been determined by a jury: the nature of his conduct, its protraction, and his failure to demonstrate that he would not continue the conduct.

The state appellate court rejected Petitioner's claim of sentencing error:

> [Petitioner] admitted an April 2003 prior strike conviction for making criminal threats (§ 422). At sentencing, after denying defendant's *Romero* motion to strike the prior strike allegation (*People v. Romero* (1996) 13 Cal.4th

19

497), the court imposed the upper term on counts 1 through 4 "in view of the nature of the conduct and its protraction, it appears that [Petitioner lacks] any demonstration of intention not to continue the conduct."

In *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, the United States Supreme Court applied the Sixth Amendment and held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be tried to a jury and proved beyond a reasonable doubt. For this purpose, the statutory maximum is the maximum sentence that a court could impose based solely on facts reflected by a jury's verdict or admitted by the defendant. When a sentencing court's authority to impose an enhanced sentence depends upon additional factfinding, there is a right to a jury trial and proof beyond a reasonable doubt. (*Blakely v. Washington, supra*, 542 U.S. at pp. 301-305.) In *Cunningham v. California* (2007) 549 U.S. ___ [127 S. Ct. 856, 871], the high court held that California's determinate sentencing law violated a defendant's federal right to trial because it assigned to the trial judge, not the jury, the authority to make factual findings that subject the defendant to the possibility of an upper term.

"The United States Supreme Court has recognized two exceptions to a defendant's Sixth Amendment right to a jury trial on an aggravating fact that renders him or her eligible for a sentence above the statutory maximum. First, a fact admitted by the defendant may be used to increase his or her sentence beyond the maximum authorized by the jury's verdict. [Citation.] Second, the right to jury trial and the requirement of proof beyond a reasonable doubt do not apply to the aggravating fact of a prior conviction. [Citations.]" (*People v. Sandoval* (2007) 41 Cal.4th 825, 836-37.) Moreover, "as long as a single aggravating circumstance that renders a defendant *eligible* for the upper term sentence has been established in accordance with the requirements of *Apprendi* and its progeny, any additional [factfinding] engaged in the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to a jury trial. (*People v. Black* (2007) 41 Cal. 4th 799, 813."

Here, [Petitioner] admitted he was previously convicted by jury trial of criminal threats against the same victim. Under *Apprendi*, [Petitioner's] admission of a prior conviction was sufficient to raise the statutory maximum from the middle to the upper term. (*Apprendi v. New Jersey, supra*, 530 U.S. at p. 490.) In addition, the court imposed the upper term in part because of "the nature of the conduct and its protraction." This statement by the court could reasonably be constructed as a reference to [Petitioner's] continuing criminality and recidivism, and as such, was an aggravating factor properly considered by the court.

Because at least one aggravating factor was established by means that independently satisfied the requirements of the Sixth Amendment and rendered [Petitioner] eligible for the upper term, we conclude the court properly sentenced him to the upper term on count 4.

Doc. 9, Exh. 9 at 21–22.

### A.    Legal Standard

In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  The Supreme Court later clarified "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis omitted).  This means "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum."  *Cunningham v. California*, 549 U.S. 270, 288 (2007).  In *Cunningham*, the Supreme Court, citing *Apprendi* and *Blakely*, held California's Determinate Sentencing Law violates the Sixth Amendment right to a jury trial to the extent it "authorizes the judge, not the jury, to find the facts permitting an upper term sentence" beyond the middle term.  *Id.* at 293.

### B.    Analysis

Cal. Penal Code § 646.9(c)(2) sets forth a sentence of two, three or five years for a conviction under this section.  Cal. Penal Code § 646.9(c)(2).  At the time of Petitioner's sentencing, Section 1170(b) of the California Penal Code required the court to impose the middle term "unless there are circumstances in aggravation or mitigation of the crime."  Cal. Penal Code § 1170(b) (2005).  The middle term of three years was therefore considered the statutory maximum for purposes of applying *Apprendi*.  *Cunningham*, 549 U.S. at 273.

The state appellate court's conclusion that there was no sentencing error was a reasonable application of federal law.  Petitioner admitted a prior conviction for stalking the same individual.  The exception to *Apprendi* and *Cunningham* — that a prior conviction need not be pleaded in an indictment or proved to a jury beyond a reasonable doubt — applies.  *Butler v. Curry*, 528 F.3d 624, 643–44 (9th Cir. 2008) (citing *Apprendi*,

530 U.S. at 476, and *Almendarez-Torres v. United States*, 523 U.S. 224, 247 (1998))

("[O]ur obligation to apply the *Almendarez-Torres* exception [remains] unless and until it

is rejected by the Supreme Court."). *Apprendi*'s prior conviction exception is clearly

established precedent from the Supreme Court. *Almendarez-Torres*, 523 U.S. at 247.

Given the above, Petitioner's claim of sentencing error is meritless and must be denied.

## IV.    Claim 4 – Sufficiency of the Evidence

Petitioner argues that his conviction for stalking was based on legally insufficient

evidence.  Respondent argues that federal habeas review for this claim is barred by the

state appellate court's application of the state procedural bar set forth in *In re Lindley*, 29

Cal. 2d 709, 723 (1947).  The citation to this particular section of *In re Lindley* invokes

the state procedural bar rule that sufficiency of the evidence claims cannot be raised in a

state habeas petition.  *Carter v. Giurbino*, 385 F.3d 1194, 1198 (9th Cir. 2004).  The

*Lindley* procedural bar constitutes an independent and adequate state ground barring

federal review, and has been consistently applied by California courts since 1947.  *Id.*

### A.    Procedural Bar

Generally, federal habeas review is barred where the state court decision relies on

an independent and adequate state law ground.  *Coleman*, 501 U.S. at 729–30.  However,

in this instance, the state appellate court denied the state habeas petition with a string

citation to numerous cases, and it is unclear which case applies to which claim.  When

presented with this kind of ambiguous opinion from a state court, the Ninth Circuit has

held that the petitioner's claims are not procedurally barred.  *See Washington v. Cambra*,

208 F.3d 832, 833–34 (9th Cir. 2000) (reversing dismissal of habeas petition where

California Supreme Court invoked two state procedural bars without specifying which

rule applied to which claim and one of the two bars was not independent of federal law).

Arguably, the *Lindley* procedural bar can apply only to the sufficiency of the evidence

claim and is therefore an adequate and independent state law ground barring federal

habeas review of this claim.  *See Carter*, 385 F.3d at 1198.  However, in an abundance of

1  caution, the Court proceeds to the merits of Petitioner's insufficiency of the evidence

2  claim.

3  **B.  Legal Standard**

4  The Due Process Clause "protects the accused against conviction except upon

5  proof beyond a reasonable doubt of every fact necessary to constitute the crime with

6  which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who

7  alleges that the evidence in support of his state conviction cannot be fairly characterized

8  as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt

9  therefore states a constitutional claim, which, if proven, entitles him to federal habeas

10  relief.  *Jackson v. Virginia*, 443 U.S. 307, 321, 324 (1979).  *See, e.g., Wigglesworth v.*

11  *Oregon*, 49 F.3d 578, 582 (9th Cir. 1995).  The federal court determines only "whether,

12  'after viewing the evidence in the light most favorable to the prosecution, *any* rational

13  trier of fact could have found the essential elements of the crime beyond a reasonable

14  doubt.'" *Jackson*, 443 U.S. at 319.  Only if no rational trier of fact could have found proof

15  of guilt beyond a reasonable doubt, has there been a due process violation.  *Id.* at 324.

16  If confronted by a record that supports conflicting inferences, a federal habeas

17  court "must presume – even if it does not affirmatively appear in the record – that the trier

18  of fact resolved any such conflicts in favor of the prosecution, and must defer to that

19  resolution." *Id.* at 326.  A jury's credibility determinations are therefore entitled to near-

20  total deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most

21  exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit

22  credibility determinations.  *Id.*  (credibility contest between victim alleging sexual

23  molestation and defendant vehemently denying allegations of wrongdoing not a basis for

24  revisiting jury's obvious credibility determination).

25  **C.  Analysis**

26  Petitioner was convicted of stalking with a prior conviction for stalking in

27  violation of Cal. Penal Code § 646.9(c)(2).  The elements of the offense are that the

28

person (1) willfully and maliciously harassed, or willfully, maliciously, and repeatedly followed another person, (2) made a credible threat with the intent to place that person in reasonable fear for his or her safety, and (3) had been previously convicted of stalking. Cal. Penal Code § 646.9(c)(2); *see also* CALCRIM No. 1301.

Harassing means "engag[ing]in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." Cal. Penal Code § 646.9(e). The relevant section of the California Penal Code defines "course of conduct" as "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose," but noting that constitutionally protected activity is not included within the meaning of "course of conduct." *Id.* at subsection (f). The section further defines "credible threat" as follows:

> For the purposes of this section, "credible threat" means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. The present incarceration of a person making the threat shall not be a bar to prosecution under this section. Constitutionally protected activity is not included within the meaning of "credible threat."

*Id.* at subsection (g). For the purposes of this section, a person acts maliciously when he intentionally does a wrongful act or when he acts with the unlawful intent to disturb, annoy, or injure someone else. CALCRIM No. 1301.

Petitioner alleges that insufficient evidence supports his conviction because (1) a CDCR administrative proceeding found that his December 2004 self-described "pre-litigation" letter to Citibank did not violate the terms of his protective order (Docket #1 at 26); (2) for the two and a half years prior to the conviction at issue, Petitioner had not come within a distance of less than 100 yards to the residences, vehicles, or places of employment of Hart or her family members (*id.* at 27–28); and had not contacted Hart or

her family members or her friends via written correspondence, telephone or email (*id.* at 27–29); and (3) Petitioner's communications to Citibank contained no obscene or profane language "that could reasonably be construed as conveying a 'credible threat' to inflict physical harm to the physical safety of [Hart] or any other person" (*id.* at 29–30).

The Court has carefully reviewed the record, keeping in mind that the Court must presume that the jury resolved any conflicts in the evidence in favor of the prosecution, and defer to that resolution. *See Jackson*, 443 U.S. at 326. The record indicates that there was sufficient evidence presented at trial to support the jury's guilty verdict.

The evidence presented at trial provided the following context for Petitioner's charged offenses in 2004. Petitioner had previously contacted Citibank alleging that Hart used marijuana regularly and engaged in criminal conduct, once in 2002 and once in 2003. 4 RT 118–134, 125–126. Both times, Citibank conducted investigations into the allegations and both times, Citibank's investigations determined that the allegations were meritless. 4 RT 126. Citibank informed Petitioner about the outcome of the investigations. 4 RT 129–130. Citibank informed Petitioner that it would not be investigating his allegations any further. *Id.* at 130. Petitioner objected to this decision and continued to send letters to, leave voicemails with, and deliver letters to Citibank regarding his allegations. *Id.* at 130–145.

Petitioner was convicted of stalking in April 2003. Clerk's Transcript[6] ("CT") 256–258. When Petitioner was placed on probation on August 14, 2003, the superior court ordered Petitioner not to contact Hart or her employer, both as a term of Petitioner's probation and as a component of the 10-year protective order issued by the court. Doc. #9, Exh. 4 at 916–917 (terms of probation), 922–923 (ordering same terms for 10-year protective order).

---

[6]The Clerk's Transcript is lodged as Exhibit 1 to Respondent's Answer (Docket #9).

25

Approximately two months after he was placed on probation, Petitioner filed a lawsuit against Hart.  4 RT 203.  Hart testified that she believed that the litigation was an indication that Petitioner intended to make good on all his threats against her, including killing her.  *Id*.

On January 13, 2004, a written 10-year protective order was filed.  4 RT 201; CT 263.  The order stated that Petitioner was not to annoy, harass, strike, threaten, sexually assault, batter, stalk, destroy the personal property of, or otherwise disturb Hart.  It also prohibited Petitioner from having contact with Hart through a third party, except an attorney of record.  CT 262.

Despite the protective order and Citibank's prior investigation, Petitioner again sought to publicize his allegations regarding Hart's drug use and criminal behavior.  In 2004, he contacted Citibank nine separate times and the district attorney's office twice, making the same allegations of drug use and criminal conduct that he had raised in 2003.  Petitioner "strongly advised" that Citibank require Hart to undergo drug testing, administer a polygraph examination to Hart "so she [Hart] can come to grips with her problem, [and] seek appropriate corrective therapy."  4 RT 136.  Petitioner also swore to continue this conduct.  5 RT 328 ("I'm going to do these things [publicize to society that Hart is a drug user] for the rest of my life . . .")

The jury was presented with evidence that in 2002 Petitioner had previously threatened bodily harm to Hart and to destroy Hart's life and her job, CT 278–282, 3 RT 88–89, 92, and that Hart reasonably feared for her safety due to Petitioner's communications to Citibank and the district attorney's office in 2004.  Given that Petitioner wanted Citibank to take action regarding Hart, the jury could reasonably infer that Petitioner intended for Hart to learn of his correspondence to Citibank regarding her.

There was also substantial evidence that Petitioner knowingly and willfully engaged in a course of conduct directed at Hart, even if it was via correspondence to third parties, that seriously alarmed her.  Since Citibank's two investigations had concluded

26

that Petitioner's allegations were baseless and since Petitioner engaged in such conduct despite a protective order prohibiting him from contacting Hart through a third party or otherwise annoying or harassing her, it was reasonable for the jury to conclude that Petitioner's conduct served no legitimate purpose and was made with the intent to place Hart in reasonable fear for her safety.  *See Jackson*, 443 U.S. at 326.  On such a record, the state court did not commit a constitutional error by not entering a judgment of acquittal.

## V.   Claim 5 – First Amendment Free Speech Claim

Petitioner argues that his conviction for stalking violated his First Amendment right to free speech.  He argues that the letters he sent to Citibank, the Alameda County of the District Attorney, the Oakland Police Department, and the United States Department of Justice regarding Hart are protected under the First Amendment because they "narrated facts that were within [his] personal knowledge . . . and concerned matters of public interest and benefit to society at large."  Doc. #1 at 32.  Respondent argues that federal habeas review is barred for Petitioner's First Amendment free speech claim because the state appellate court clearly and expressly applied the *Dixon* bar in denying the state habeas petition, and the *Dixon* bar is an independent and adequate basis for denying federal habeas relief.

### A.   Procedural Bar

Pursuant to the *Dixon* bar, a California court will not review the merits of a claim raised on habeas if that claim could have been raised in a timely appeal but was not.  *In re Dixon*, 41 Cal. 2d 756, 759 (1953).  However, this Court will not address whether *Dixon* is an independent and adequate state ground barring federal habeas relief because the state appellate court opinion is ambiguous and requires that the Court reach the merits of Petitioner's claim.  *See* Section IV.A *infra* and *Washington*, 208 F.3d at 833–34.  Because the state courts issued no reasoned opinion on this claim, the Court must conduct an independent review of the record, to determine whether the state court denial of this

1    claim was contrary to, or an unreasonable application of, clearly established Supreme

2    Court law.  *See Plascencia*, 467 F.3d at 1198.

3        **B.    Legal Standard**

4        The First Amendment states that "Congress shall make no law . . .  abridging the

5    freedom of speech . . ." U.S. Const., 1st. Amend.  It is applicable to the states thru the

6    Due Process Clause of the Fourteenth Amendment.  *Gitlow v. New York*, 268 U.S. 652,

7    666 (1925).  The right to free speech is not absolute and the government may regulate

8    certain categories of expression consistent with the Constitution.  *Virginia v. Black*, 538

9    U.S. 343, 358 (2003).  These categories include obscenity, defamation, fraud, incitement,

10   and speech "integral to criminal conduct."  *United States v. Stevens*, 130 S. Ct. 1577,

11   1584 (2010).  "The First Amendment . . . permits a State to ban a 'true threat.'  'True

12   threats' encompass those statements where the speaker means to communicate a serious

13   expression of an intent to commit an act of unlawful violence to a particular individual or

14   group of individuals.  The speaker need not actually intend to carry out the threat.  Rather,

15   a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from

16   the disruption that fear engenders,' in addition to protecting people 'from the possibility

17   that the threatened violence will occur.'"  *Virginia*, 538 U.S. at 359 (citations omitted).

18   Whether a statement constitutes a "true threat" must be considered "in context," taking

19   into account such factors as whether the statement was expressly conditional and what

20   reaction it evoked from the listeners.  *Watts v. United States*, 394 U.S. 705, 708 (1969).

21       **C.    Analysis**

22       Petitioner's correspondence with Citibank is not protected by the First

23   Amendment.  In 2002 and 2003, Citibank investigated Petitioner's allegations that Hart

24   was engaging in criminal conduct.  Both investigations concluded that Petitioner's

25   allegations were meritless, and Petitioner was informed of the results of the investigation.

26   4 RT 125–126, 130–131, 136–137.  The jury reasonably found that Petitioner's

27   subsequent letters to Citibank in 2003, raising the same issue that had been previously

28                                              28

investigated and found meritless, did not serve a legitimate purpose and constituted stalking within the meaning of Cal. Penal Code Section 646.9.

Moreover, Petitioner had previously explicitly threatened to kill Hart and had disregarded a restraining order and a protective order.  The record shows that the letters caused Hart to fear for her safety.  4 RT 164–165, 213, 214, 192.  Given this context, Petitioner's letters cannot be considered protected speech under the First Amendment. *Watts*, 394 U.S. at 708.

## VI.    Claim 6 – Prosecutorial Misconduct Claim

Petitioner argues that the prosecutor committed misconduct during his cross-examination of character witness Artis Wiseman, and during his examination of Hart.  Respondent argues that federal habeas review is barred for this claim pursuant to the state appellate court's application of the *Dixon* bar.

### A.    Procedural Bar

As discussed above, the state appellate court opinion is ambiguous; therefore the Court will conduct an independent review of the record and reach the merits of Petitioner's claim to determine whether the state court denial of the claim was contrary to, or an unreasonable application of, clearly established Federal law.  *Plascencia*, 467 F.3d at 1198.

### B.    Legal Standard

Prosecutorial misconduct is cognizable in federal habeas corpus proceedings. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *See id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Federal habeas relief for claims of prosecutorial misconduct is appropriate only if the misconduct has a substantial

and injurious effect or influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 637.

The court considers various factors in determining whether the misconduct amounted to a violation of due process.  First, the court determines whether the trial court issued a curative instruction.  The court may also take into account the weight of evidence of guilt.  *Compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor).  Another factor is whether the misconduct was isolated or part of an ongoing pattern.  *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987).  The court may also consider whether the misconduct relates to a critical part of the case.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972).  Finally, the court may look at whether a prosecutor's comment misstates or manipulates the evidence.  *See Darden*, 477 U.S. at 182.

**C.    Analysis**

1.    Cross-examination of Artis Wiseman

Petitioner alleges that the prosecutor committed misconduct when he suggested during the cross-examination of character witness Artis Wiseman that Petitioner had been pressured to resign from the Oakland Police Department.  Petitioner states that not only was such an assertion untrue, but the prosecutor made this assertion despite having no evidentiary support.  The relevant colloquy is as follows:

> Q:    Are you aware of the circumstances under which [Petitioner] was asked to leave the Oakland Police Department?
> A:    I am not aware of that.  I am not aware that he was asked to leave.  I thought he left to attend law school.

5 RT 263.  First, Petitioner has not established that the prosecutor's question was unsubstantiated or misstated the evidence.  Petitioner's unsupported statement that he left the Oakland Police Department in good standing is not sufficient, without more, to

1   warrant habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory

2   allegations which are not supported by a statement of specific facts do not warrant habeas

3   relief.").  Secondly, even if the prosecutor's assertion had been unsubstantiated, Petitioner

4   fails to show that the prosecutor's question had a "substantial and injurious effect or

5   influence in determining the jury's verdict."  *See Brecht*, 507 U.S. at 637.  The character

6   witness's answer undermined any suggestion that Petitioner was asked to leave the

7   Oakland Police Department.  Wiseman testified that Petitioner chose to leave the police

8   department to attend law school.  Petitioner also testified that he had resigned from the

9   law force in 1972 to pursue a law degree.  The prosecutor's brief question, immediately

10  refuted by Wiseman, did not render Petitioner's trial fundamentally unfair or have a

11  substantial and injurious effect on the verdict.  Finally, although no curative instruction

12  was given, this colloquy did not relate to a critical part of the case.  The defense theory

13  focused on whether his behavior met the legal definition of stalking, and not on

14  Petitioner's character.  6 RT 444–446.  The record has significant evidence from which

15  the jurors reasonably determined that Petitioner was guilty of stalking Hart, including the

16  undisputed evidence that Petitioner sent numerous letters to Citibank, and that these

17  letters caused Hart to fear for her life because she viewed them as an indication that

18  Petitioner was going to follow through on this threat to kill her:

19      [My reaction to learning that Petitioner had sent another letter to Citibank was]
        [j]ust that he was following through with his threats, that he was determined
20      for me to lose my job . . . He's going to follow through on — every threat that
        [Petitioner] has made . . . there is only one last threat that he hasn't followed
21      through on and that is to take my life.  This man is going to take my life.

22  4 RT 212.  Similarly, the San Quentin correctional counselor testified that when she

23  informed Hart that Petitioner was being released from custody, Hart was "extremely

24  fearful, very anxious . . . overall very scared."  4 RT 192.  Any negative implication by

25  the prosecutor's questions would have been outweighed in any case by the weight of the

26  evidence of the guilt.

27          2.      Examination of Hart

28
                                        31

Petitioner further argues that the prosecutor committed misconduct by falsely suggesting, during his examination of Hart, that Petitioner had "engaged in a pattern of frivolous litigation against [Hart] and her family."  Doc. #11 at 61.  The relevant colloquy is as follows:

[Prosecutor]:   Moving later in time to October 21st, 2003.  Did [Petitioner] file a lawsuit against you?

Hart:   Yes, a civil lawsuit.  He was following through on all this threats, which he still is.  One of his threats were --

[Defense counsel:]   Objection.

The Court:   Overruled.

Hart:   -- were that he would take my condo.  He would own my car.  He would destroy my life, my job.  He was going to kill me.  So he's following through with all his threats.

[Prosecutor]:   Let me ask you about the lawsuit.  What was the nature, if you know, of the claims that he brought against you in that lawsuit?

[Hart]:   He was claiming that I was causing him stress and some other things I can't remember.

[Prosecutor]:   What did you do after you were sued?  What steps did you take in response?

[Hart]:   I had to hire a lawyer to represent me.

[Prosecutor]:   What happened next in the court of that lawsuit?

[Hart]:   The judge dismissed it on the basis of frivolous lawsuit.

[Prosecutor]:   Was there any further action or any further events in the course of that lawsuit?

The Court:   Beyond the judge dismissing?

[Prosecutor]:   Once the case was dismissed, was there anything else that happened in the course of that lawsuit?

[Hart]:   He just went back to prison.

[Prosecutor]:   I was speaking in the context of that lawsuit.  After it was dismissed, was there any more paperwork or anything, or did that put an end to it.

[Hart]:   Well, that put an end to it as far as him being able to come at me civilly.

32

[Prosecutor]: My question is very vague.

The Court:     Thanks.  She answered, I think, but let me be a little leading about it.  Do you know if there was an appeal taken from the judge's order dismissing the civil suit on Mr. Muhammad's behalf?  You don't know?

[Hart]:        No.

The Court:     Do you know if there was a motion for reconsideration of the judge's order dismissing the suit?

[Hart]:        The civil suit itself?

The Court:     Yes, ma'am.

[Hart]:        No.  I am not sure.  I can't remember.

The Court:     So she doesn't know.  Doesn't sound like it, but she doesn't know.

4 RT 203–204.

It does not appear that the prosecutor misstated the evidence; Hart stated that the lawsuit was dismissed as frivolous and Petitioner offers no evidence to the contrary.  In fact, during his direct examination, he acknowledges that he does not know why his lawsuit was dismissed.  5 RT 298.  Petitioner's unsupported assertion that his litigation was not frivolous is insufficient to warrant federal habeas relief.  *See James*, 24 F.3d at 26.  Furthermore, Petitioner's characterization of the line of questioning is not supported by the record.  No pattern of frivolous litigation is implied.  The prosecutor only asks about one case, which Petitioner admits filing, and asks about Hart's understanding as to why it was dismissed.  Any suggestion that the lawsuit was frivolous was balanced by Petitioner's statements on cross-examination explaining in detail why he felt the lawsuit had merit.  5 RT 336.  The prosecutor's question as to whether the lawsuit was frivolous does not rise to the level of prosecutorial misconduct requiring federal habeas relief since the question did not have a substantial and injurious effect or influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 637.

**VII.   Claim 7 – First Amendment Freedom of Religion claim**

Petitioner argues that he was wrongly convicted and sentenced in violation of his First Amendment right to freely exercise the religion of his choice.  Specifically, Petitioner claims: (1) during Hart's direct examination, the prosecutor asked her about a book which Petitioner had given to her which Hart stated was written by a Muslim woman (Docket #1 at 36); (2) Hart stated that she would not "cover her head" nor wear "long dresses," though she also admitted that Petitioner had not requested that she do so (*id.* at 37); (3) Hart made multiple derogatory and inaccurate defamatory statements regarding Petitioner's chosen religion (*id.*); and (4) the pre-sentence probation report made "multiple unconstitutional references" regarding Petitioner's chosen religion (*id.* at 37–38).  Respondent argues that federal habeas review is barred for this claim pursuant to the state appellate court's application of the *Dixon* bar.

**A.     Procedural Bar**

As discussed above, the state appellate court opinion is ambiguous; therefore the Court will conduct an independent review of the record and reach the merits of Petitioner's claim to determine whether the state court denial of the claim was contrary to, or an unreasonable application of, clearly established Federal law.  *Plascencia*, 467 F.3d at 1198.

**B.     Legal Standard**

The First Amendment, made applicable to the states by the Fourteenth Amendment, bars the state from making laws prohibiting the free exercise of religion.  U.S. Const. amends. I and XIV § 1.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).  However, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or

34

prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) *superseded by statute on other grounds as stated in Sossamon v. Texas*, 131 S. Ct. 1651 (2011).

### C.   Analysis

Petitioner's claim is unclear.  He does not explain how the references to his religious beliefs by Hart or by the probation pre-sentence report infringed upon his free exercise of religion, but the Court presumes that he is alleging that his conviction and sentence unconstitutionally relied upon derogatory references to his religion in violation of the First Amendment.  *See, e.g., Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001) (directing courts to construe *pro se* petitions liberally); *cf. Selam v. Warm Springs Tribal Correctional Facility*, 134 F.3d 948, 952 (9th Cir. 1998) (holding that magistrate judge properly construed petition as challenging two convictions, even though the petitioner identified only one conviction as the "offense involved" on the petition form, because the factual allegations of the petition alluded to both of the petitioner's trials).

Petitioner has not established a First Amendment violation.  Although his religious beliefs were discussed during the trial, they were not the focus of the trial nor the basis for his convictions.  Hart referenced Petitioner's religious beliefs primarily in the context of discussing why they separated in September 2002.  3 RT 91–92, 4 RT 219.  However, the prosecution's focus was on Petitioner's conduct after that time.  Specifically, the prosecution focused on the time period from December 2003 to December 2004 (4 RT 407), and identified the following as a course of conduct of harassment:  a series of telephone calls to Hart in December 2003, four months after Petitioner had been sentenced in Alameda County and in violation of a protective order; and phone calls and letters to Citibank in January 2004, February 2004, May 2004 and December 2004, accusing Hart of drug use and demanding that Citibank conduct additional investigations into Hart.

Hart referred to Petitioner's religious belief one other time, stating that in a

35

conversation with Petitioner about his Muslim faith, he had stated that he believed in "an eye for an eye tenfold" meaning that "if somebody did something to him or he felt that they did something to him, he would payback tenfold." 4 RT 214.   To the extent Petitioner argues that this reference was derogatory or inaccurate and led to his conviction, the record indicates otherwise.  Hart's testimony established that her belief that Petitioner would never cease his harassment of her was not based on her understanding of how he practiced his religion.  Rather, she felt fearful because of Petitioner's pattern of conduct towards her over the four years preceding the trial, starting with repeated threats to kill her in 2002, vandalizing her home in 2002, visiting her workplace throughout 2002, and then repeated harassment in 2003 despite the entry of a protective order and despite Petitioner being incarcerated during some of that time, followed by letters to her workplace in 2004 essentially stating that she should be terminated from her employment.  Petitioner's exercise of his religion was not the basis for his convictions.  Nor was Petitioner's exercise of his religion the basis for his sentence.  Rather, the trial court cited "the nature of the conduct and its protraction . . . and [Petitioner's] lack of any demonstration of intention not to continue the conduct" and Petitioner's prior serious felony conviction, as justification for imposing a 10-year term.

In addition, Petitioner fails to show that Cal. Penal Code § 646.9 burdens his free exercise of the religion of his choice.  Cal. Penal Code § 646.9 prohibits stalking, defined as when a person "willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety . . ."  Cal. Penal Code § 646.9.  The statute is neutral on its face and of general applicability.  The statute's intent is to protect victims from both physical and psychological harm.  *See, e.g.,* CALCRIM No.  1301.  Its burden on any defendant's religious practice, if at all, is necessarily incidental to that goal.  Petitioner's conviction and sentence did not violate the First Amendment, and federal habeas relief is unavailable for this claim.

## VIII.   Claim 8 – Eighth Amendment claim

Petitioner was sentenced to a prison term of 10 years, comprised of the upper term of 5 years for his stalking conviction, doubled pursuant to the three strikes law for his prior serious conviction of criminal threats.  RT 522–523.  Petitioner argues that his ten-year sentence for one count of stalking with a prior serious felony conviction for criminal threats constitutes cruel and unusual punishment in violation of the Eighth Amendment for the following reasons: (1) he never actually inflicted or attempted to inflict physical harm on Hart; (2) he was 57 years old when he suffered his first criminal conviction; (3) he was a member of the armed forces, a police officer with the City of Oakland, and an active member of the California State Bar Association; (4) he was gainfully employed as a professor at California State University, Hayward at the time of the initial offenses; (5) his crimes did not involve violence, child victims, sex offenses, narcotics, or weapons; and (6) his criminal conduct was reasonably related to the exercise of constitutionally protected fundamental rights.  Doc. #1 at 39–42.  Respondent argues that federal habeas review is barred for this claim pursuant to the state appellate court's application of the *Dixon* bar.

### A.   Procedural Bar

As discussed above, the state appellate court opinion is ambiguous; therefore the Court will conduct an independent review of the record and reach the merits of Petitioner's claim to determine whether the state court denial of the claim was contrary to, or an unreasonable application of, clearly established Federal law.  *Plascencia*, 467 F.3d at 1198.

### B.   Legal Standard

The Eighth Amendment contains a "narrow" proportionality principle which forbids only "extreme sentences that are grossly disproportionate to the crime"; it does not require strict proportionality between crime and sentence."  *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010) (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991))

37

(quotations omitted).  "[O]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare."  *See Solem v. Helm*, 463 U.S. 277, 289–90 (1983) (opinion of Kennedy, J.) (emphasis in original).   In analyzing a disproportionality challenge to a specific sentence, the court "considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Graham*, 130 S. Ct. at 2021.  *Graham* definitively adopted a test for determining whether a specific sentence is grossly disproportional:

> A court must begin by comparing the gravity of the offense and the severity of the sentence.  "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.  If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.

130 S. Ct. at 2022 (citations omitted) (quoting *Harmelin*, 501 U.S. at 1005 (opinion of Kennedy, J.)).

In determining whether a sentence is grossly disproportionate, the Court must keep in mind "four principles of proportionality review – 'the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors . . .'" *Ewing v. California*, 538 U.S. 11, 24–25 (2003) (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring)).  Substantial deference is granted to legislatures' determination of the types and limits of punishments for crimes.  *See United States v. Gomez*, 472 F.3d 671, 673–74 (9th Cir. 2006) (finding that Congress' decision to grant a reprieve from statutory minimums only to certain categories of criminal defendants does not violate the Eighth Amendment).

In determining whether the sentence is grossly disproportionate under a recidivist sentencing statute, the Court looks to whether such an "extreme sentence is justified by the gravity of [an individual's] most recent offense and criminal history." *Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004) (holding sentence of twenty five years to life

on petty theft with prior conviction was grossly disproportionate to crime where previous two strikes were the result of one negotiated plea resulting in a single county jail sentence).  In considering the relevance of the recent offense and criminal history, a court must consider the "factual specifics" of an individual's priors to determine whether the conduct involved violence or was particularly serious.  *Reyes v. Brown*, 399 F.3d 964, 970 (9th Cir. 2005) (holding that the record before the district court was not sufficiently detailed to make such a finding and remanding for further development of the record).

Under this proportionality principle, the threshold determination for the court is whether petitioner's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. *See Norris v. Morgan*, 622 F.3d 1276, 1290 (9th Cir. 2010) (concluding that sentence of life without possibility of parole for conviction of first degree child molestation of 5-year old girl, where touching was brief and over clothing, was not grossly disproportionate); *United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992) (quoting *Harmelin*, 501 U.S. at 1005); *accord Ewing*, 538 U.S. at 11–12 (applying *Harmelin* standard).  Only if such an inference arises does the court proceed to compare petitioner's sentence with sentences in the same and other jurisdictions.  *See Harmelin*, 501 U.S. at 1004–05; *Bland*, 961 F.2d at 129; *cf. Ewing*, 538 U.S. at 23 (noting that *Solem* does not mandate comparative analysis within and between jurisdictions).  The threshold for an ""nference of gross disproportionality" is quite high.  *See, e.g., Ewing,* 538 U.S. at 29–31 (sentence of 25 years to life for conviction of grand theft with prior convictions was not grossly disproportionate); *Harmelin*, 501 U.S. at 1005 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality).

C.     **Analysis**

Deferring substantially to the legislature's determination of the appropriate sentencing scheme for stalking and recidivists, the Court finds that Petitioner fails to

demonstrate that his sentence was cruel and unusual in violation of the Eighth Amendment. The crime of stalking is a serious offense that involves a credible threat of bodily harm to the victim. *See* CALCRIM No. 1301. When perpetrated against a dating partner, it is considered a form of domestic violence. *People v. Ogle*, 185 Cal. App. 4th 1138, 1143 (2010). Because Petitioner was sentenced as a recidivist under California's Three Strikes law, the Court must consider both the triggering offense and Petitioner's criminal history in order to accord proper deference to the legislature's "legitimate penological goal" in imposing a three strikes sentence. *Ewing*, 538 U.S. at 29; *see also Bland*, 961 F.2d at 129 (in judging appropriateness of a sentence under a recidivist statute, a court may take into account the government's interest not only in punishing the offense of conviction, but also its interest in dealing in a harsher manner with those who are repeat criminals) (citations and quotations omitted).

The legislature's decision to impose an upper-term sentence of five years for stalking and to allow for that sentence to be doubled for a prior conviction does not violate the Eighth Amendment. In Petitioner's case, his December 2003 phone calls and 2004 letter-writing campaign to Hart's employer followed two years of harassment that included vandalism and threats of violence against Hart, and took place despite the existence of a protective order. Hart testified that she believed that Petitioner's letters and the litigation against her were indications that Petitioner intended to make good on all his threats against her, including killing her. 4 RT 203. Additionally, Petitioner indicated that he was likely to continue the behavior which terrorized Hart. He testified and continues to argue that his actions are protected under the First Amendment. Given Petitioner's actions, it cannot be said that his sentence is grossly disproportionate to the crime committed, and the Court therefore declines to compares Petitioner's sentence with sentences in the same jurisdiction and other jurisdictions. *See Harmelin*, 501 U.S. at 1004-05; *Bland*, 961 F.2d at 129; *cf. Ewing*, 538 U.S. at 23 (noting that *Solem* does not mandate comparative analysis within and between jurisdictions). Petitioner is not entitled

1    to federal habeas relief on his Eighth Amendment claim.

2    **IX.     Ineffective Assistance of Trial Counsel**

3           Petitioner alleges that trial counsel was constitutionally ineffective for failing to

4    conduct a reasonable pretrial investigation of the case, and identifies 19 separate

5    omissions by trial counsel relating to documentary evidence and witness testimony. Doc.

6    #1 at 43–54.  Respondent argues that federal habeas review is barred for this claim

7    pursuant to the state appellate court's application of the *Dixon* bar.

8           **A.     Procedural Bar**

9           As discussed above, the state appellate court opinion is ambiguous; therefore the

10   Court will conduct an independent review of the record and reach the merits of

11   Petitioner's claim to determine whether the state court denial of the claim was contrary to,

12   or an unreasonable application of, clearly established Federal law.  *Plascencia*, 467 F.3d

13   at 1198.

14          **B.     Legal Standard**

15          The Sixth Amendment guarantees the right to effective assistance of counsel.

16   *Strickland*, 466 U.S. at 686.  To prevail on a claim of ineffective assistance of counsel,

17   Petitioner must show both that counsel's performance was deficient and that the deficient

18   performance prejudiced Petitioner's defense.  *Id.* at 688.  To prove deficient performance,

19   Petitioner must demonstrate that counsel's representation fell below an objective standard

20   of reasonableness under prevailing professional norms.  *Id.*  To prove counsel's

21   performance was prejudicial, Petitioner must demonstrate a "reasonable probability that,

22   but for counsel's unprofessional errors, the result of the proceeding would have been

23   different.  A reasonable probability is a probability sufficient to undermine confidence in

24   the outcome." *Id.* at 694.  A court must indulge a strong presumption that counsel's

25   conduct falls within the wide range of reasonable professional assistance.  *Id.* at 689;

26   *Wildman*, 261 F.3d at 838 (finding no deficient performance by counsel who did not

27   retain a ballistics expert on a menacing charge where the same expert had been used in

28                                              41

the successful defense of the same defendant on a felon-in-possession charge).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (approving district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

**C.   Analysis**

1)   Failure to Obtain Documentary Evidence

Petitioner claims that his counsel was ineffective for failing to obtain certain documentary evidence. A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *See Strickland,* 466 U.S. at 691; *Cullen*, 131 S. Ct. at 1407. *Strickland* directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691). Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. *See Harrington*, 131 S. Ct. at 789–90 (2011). Failure to present probative, noncumulative evidence in support of a chosen defense strategy is deficient performance absent a reasonable tactical justification. *Alcala v. Woodford*, 334 F.3d 862, 870–71(9th Cir. 2003) (finding deficient performance and prejudice where counsel failed to present most probative evidence in support of alibi defense, including only evidence that established time and date of alibi). Assuming counsel should have found and presented additional evidence, a state court's rejection of a claim of ineffective assistance based on counsel's failure to pursue further investigation is reasonable if the additional evidence would not likely have caused the jury to reach a different verdict. *See Samayoa v. Ayers*, 649 F.3d 919, 929–30 (9th Cir. 2011) (affirming state court's rejection of claim of ineffective assistance where no reasonable probability

42

of different outcome for penalty phase of capital trial given that additional mitigating evidence counsel failed to present about petitioner's difficult childhood does not outweigh overwhelming aggravating evidence).

Here, as an initial matter, it is unclear whether Petitioner is arguing that trial counsel was aware of these pieces of documentary evidence and refused to introduce them into evidence, or that trial counsel would have known of these pieces of evidence had he conducted a reasonable pre-trial investigation. As discussed in detail below, he Court concludes that the documentary evidence would not have caused the jury to reach a verdict more favorable to Petitioner for various reasons — some of the evidence is not probative, some of the evidence is not admissible, some of the evidence is cumulative, and in some cases, Petitioner has made a conclusory statement that provides insufficient detail to evaluate why the evidence was relevant. Accordingly, neither the failure to discover it during a pre-trial investigation nor the failure to introduce it into evidence constituted constitutionally ineffective assistance of counsel. *Strickland*, 466 U.S. at 694. The Court addresses each piece of documentary evidence in turn.

(a) *January 2005 California Department of Corrections and Rehabilitation ("CDCR") Rules Violation Report ("RVR")*: Petitioner argues that trial counsel should have obtained and introduced into evidence the January 2005 RVR wherein a CDCR senior hearing officer "acquitted" Petitioner of charges that he violated the protective order while in prison. As Respondent notes, the record does not support Petitioner's claim that trial counsel was unaware of the RVR. Instead, trial counsel entered into a stipulation that "neither party will seek to introduce any evidence of the fact that San Quentin State Prison conducted a Rule 115 proceeding during the period from December 22, 2004 to January 13, 2005, or the disposition of that hearing." CT 127–128. Petitioner does not explain the tactical basis for this stipulation, and therefore has not overcome the strong presumption that the RVR was excluded as sound trial strategy. *See Strickland*, 466 U.S. at 689. Additionally, Petitioner could not have

suffered prejudice from the failure to introduce this report into evidence since the report has no collateral estoppel or res judicata effect in a criminal prosecution. *See, e.g., Lucido v. Superior Court*, 51 Cal.3d 335, 351–52 (1990) (probation or parole revocation hearings do not have collateral estoppel effect in a criminal action); *Standlee v. Rhay*, 557 F.2d 1303, 1305–1307 (9th Cir. 1977) (same); *United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985) (same). Finally, even if the December 2003 letter to Citibank did not violate the protective order, the jury still could have reasonably found Petitioner guilty of stalking based on his other contacts with Citibank in 2004. Trial counsel was not constitutionally ineffective by failing to introduce the January 2005 CDCR RVR into evidence.

(b) *CDCR Form 602 (Inmate Appeal)*: Petitioner argues that trial counsel was ineffective for failing to introduce into evidence Petitioner's December 28, 2004 appeal of the CDCR rules violation. Petitioner argues that the appeal demonstrates his "state of mind," e.g., that he believed that was not violating the protective order by sending Citibank a self-described "pre-litigation" letter in December 2004. Petitioner does not demonstrate that but for trial counsel's failure to introduce the appeal into evidence, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 684. There are multiple explanations for why Petitioner chose to appeal the CDCR rules violation, including a desire to avoid any penalties associated with a guilty finding. The appeal is not conclusive evidence that Petitioner lacked the intent to place Hart in fear, and Petitioner does not establish that this evidence would reasonably have caused the jury to return a more favorable verdict for Petitioner. Finally, the Form 602 would have been inadmissible as hearsay evidence of Petitioner's state of mind. Trial counsel was not constitutionally ineffective for failing to introduce into evidence Petitioner's December 2004 inmate appeal.

(c) *CDCR Diagnostic Evaluation*: Petitioner argues that trial counsel was ineffective for failing to contact and interview the two experts who conducted a

psychological diagnostic evaluation of Petitioner in June–July 2003 and concluded that Petitioner posed no threat to Hart or to the community at large.  Doc. #1 at 45.  Petitioner does not provide the court with the evaluation, or affidavits from the psychiatrists summarizing their assessments of Petitioner.  Petitioner's unsupported and conclusory assertions are insufficient to establish prejudice.  *See, e.g., Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).  Moreover, the diagnostic evaluation focuses on whether Petitioner was an actual threat to Hart, while Cal. Penal Code § 646.9 does not require that the defendant be an actual threat to the victim, but rather that the defendant intended to place the victim in reasonable fear for her life.  There was no prejudice from trial counsel's failure to admit this diagnostic evaluation or interview the psychiatrists that prepared it; a third-party opinion as to Petitioner's dangerousness does not outweigh the evidence that Petitioner deliberately and repeatedly chose to harass Hart over allegations that had been proven false by official investigations.

(d) *Transcripts from the Alameda County case; Hart's October 7, 2002 statement to Albany Police; and 2002 Civil Restraining Order from Alameda County*:  Petitioner argues that trial counsel was ineffective for failing to obtain transcripts of Hart's testimony at the preliminary hearing and trial in the Alameda County case, a copy of her October 7, 2002 signed statement to the City of Albany, and a copy of the 2002 civil restraining order for use in impeachment.  The record shows that trial counsel conducted a thorough cross-examination of Hart.  RT 214–226, 229–237, 240–242.  Petitioner does not identify what inconsistent statements were contained in the transcript, statement or restraining order that would have impeached Hart's trial testimony or undermined her credibility.  "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  *James*, 24 F.3d at 26.  Petitioner has failed to demonstrate that trial counsel was constitutionally ineffective for failing to obtain and introduce into evidence the transcript and the signed statement.

(e) *Investigative Notes of Alameda County District Attorney*

45

*Inspector Corey White and 2002 City of Albany Police Reports*:  Petitioner alleges that Inspector White had conducted an extensive investigation into the charged acts that were the basis of Petitioner's 2003 conviction, and that trial counsel's failure to obtain notes relating to this investigation constituted ineffective assistance of counsel.  Again, Petitioner's claim fails to provide sufficient specificity to allow the Court to evaluate his claim.  *See James*, 24 F.3d at 26.  Moreover, it is unclear that these notes would have been exculpatory or otherwise helpful to the defense.  Petitioner has not demonstrated that there is a reasonable probability that the introduction of these notes would have resulted in an outcome more favorable to Petitioner.  *See Strickland*, 466 U.S. at 684.

(f) *Probation File (County of Alameda, Case No. 144082)*:

Petitioner alleges that investigation of his probation file would have provided documentary evidence attesting to the contradiction between the protective order and the court's minute order, and uncovered favorable defense witnesses.  Docket #11 at 80. Petitioner again fails to provide the Court with a copy of the relevant portions of his probation file, or with support for his assertions that the probation officers would testify in his favor.  These types of conclusory allegations do not warrant federal habeas relief. Moreover, this evidence is cumulative and duplicative of Petitioner's own testimony that his probation terms, the sentencing court's minute order, and the protective order contained contradictory terms, and that he was confused as to which one governed.  The failure to investigate Petitioner's probation file did not constitute constitutionally ineffective assistance of counsel.

(g) *California State Bar Records*:  Petitioner argues that trial counsel's failure to obtain his California State Bar records and interview California State Bar officials regarding his disbarment constituted ineffective assistance of counsel because trial counsel was unprepared to minimize the negative implications of Petitioner's disbarment.  As Respondent points out, a review of the California Bar Journal Discipline Summary regarding Petitioner's disbarment indicates that Petitioner's

California State Bar records actually reflected unfavorably upon him. The summary reveals that Petitioner was disbarred because he "failed to perform competently, refund unearned fees, communicate with clients or report sanctions, improperly withdrew from representation without protecting his clients' interests, engaged in unauthorized practice of law, charged illegal fees, violated court orders and committed acts of moral turpitude." Docket #9, Exh. 5 at 2. The failure to investigate Petitioner's State Bar records or introduce them into evidence did not constitute constitutionally ineffective assistance of counsel.

(h) *City of Albany Police Reports*:  Petitioner also claims that trial counsel was ineffective for failing to obtain crime reports allegedly compiled by the City of Albany of the complaints filed by Hart against Petitioner, all of which the City of Albany had determined to be false and/or unsubstantiated. Again, the Court cannot verify Petitioner's claim that this compilation exists and that it would have been favorable to his case. This conclusory allegation does not warrant habeas relief. *James*, 24 F.3d at 26.

(i) *Photographs of Hart*:  Petitioner claims that trial counsel was ineffective for failing to obtain or admit into evidence multiple photographs depicting Hart "in the commission of various violations of the California Health and Safety Code." Docket #1 at 50. Petitioner does not deny that one photograph was admitted into evidence as an attachment to a letter he sent to Citibank, 4 RT 132, 141–144; he argues, however, that the admission of multiple photographs was necessary to impeach Hart's credibility and corroborate Petitioner's claim that Hart was engaged in criminal behavior. Doc. #11 at 82. Trial counsel's failure to present additional evidence of Hart's alleged criminal behavior did not render Petitioner's trial fundamentally unfair. Additional photographs would have been cumulative of what had already been presented. *See, e.g., Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009) (denying a habeas claim for ineffective assistance of counsel during the penalty phase where there were a significant amount of aggravating circumstances and the additional evidence would have been cumulative of

what had already been presented).  Furthermore, a jury could reasonably conclude that even if Hart was engaged in criminal behavior and Petitioner's allegations were true, she still believed that Petitioner intended to cause her harm and was fearful of him.

(j) *Telephone Records*:  Petitioner argues that trial counsel was ineffective for failing to obtain the cellular and residential telephone records of Petitioner and Hart for the period of September 2002 through January 2004.  Petitioner alleges that these phone records would have established that he did not make multiple harassing calls to Hart.  Petitioner fails to establish that the introduction of the phone records would have resulted in a reasonable probability of a more favorable outcome.  There was independent evidence of Petitioner's phone calls in September 2002, specifically, tape recordings of Petitioner's threatening messages and Hart's positive identification of Petitioner's voice. The evidence of Petitioner's guilt — his prior harassment of Hart in 2002, his repeated communications with Citibank, the content of such communications, and Hart's testimony about her relationship with him and her fear of him — outweighed any potential evidence that Petitioner had not made the phone calls in December 2003 and January 2004.  Trial counsel was not constitutionally ineffective for failing to obtain and introduce into evidence these phone records.

(k) *Citigroup Investigative Records*:  Petitioner argues that trial counsel was constitutionally ineffective for failing to seek or obtain Citibank's records relating to its investigation of Petitioner's allegations against Hart.  Petitioner alleges that these records would have revealed that the investigations were "little more than a cosmetic corporate 'sham.'"  Doc. #1 at 51–52.  Respondent notes that Citibank's investigative efforts were thoroughly covered at trial by the prosecutor and defense counsel during the direct and cross-examination of Pamela Austin.  Even if the investigation had proven to be cursory as Petitioner alleges, it would not necessarily establish that Hart was engaged in criminal conduct.  And even if Hart were engaged in criminal conduct, that is not a defense to the crime of stalking.  Accordingly, Petitioner

cannot establish that but for trial counsel's failure to obtain and introduce Citibank's investigative records, the jury would have reached an outcome more favorable to Petitioner. This claim of ineffective assistance of counsel is without merit and does not warrant federal habeas relief.

2)   <u>Failure to Interview and Call Certain Witnesses</u>

Petitioner argues that trial counsel's failure to interview the following witnesses constituted constitutionally ineffective assistance of counsel for the following reasons: (1) Deputy Probation Officers Vernon Brooks and Antoinette Stubbs allegedly would have testified that Petitioner did not violate the protective order (Docket #1 at 52); (2) Deputy District Attorney Mark McCannon allegedly would have testified that Hart was engaged in criminal conduct (*id.* at 53); (3) CDCR Correctional Lieutenant Thompson allegedly would have testified that Petitioner's December 2003 letter to Citibank did not violate the protective order (*id.* at 53 and Exh. 6); (4) Oakland Tribune Newspaper Reporter Glenn Chapman allegedly would have testified regarding Petitioner's lack of intent to threaten Hart (*id.* at 53–54); (5) CDCR senior psychologist and counselor allegedly would have testified that Petitioner did not pose a threat to Hart (*id.* at 54); and (6) owner of Isler's Liquors in Oakland, known as T, allegedly would have testified that Hart purchased marijuana from him (*id.* at 54).

To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872–73 (9th Cir. 2003). A petitioner's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. *See Bragg*, 242 F.3d at 1087.

As an initial matter, Petitioner has not shown that these witnesses were willing to testify and would have testified to these particular issues. For example, it is unclear that

49

"T" would have been willing to admit to criminal conduct.

Furthermore, the witnesses' testimony would not have created a reasonable probability that the jury would have acquitted Petitioner.

First, some of the testimony would have been inadmissible. Brooks' and Stubbs' determination that Petitioner did not violate the protective order is an impermissible legal conclusion, which is also contradicted by the fact that Petitioner was undisputedly found in violation of his probation – the terms of which were captured in the protective order – and sent to prison. Deputy District Attorney McCannon's testimony would be inadmissible because it does not appear that he had personal knowledge of any drug use by Hart. Chapman's testimony would have been inadmissible as hearsay.

Secondly, to the extent that the testimony of Lieutenant Thompson and the CDCR psychologist might have been admissible, Petitioner suffered no prejudice by the failure to call these two witnesses because, as discussed above, the CDCR rules violation report was irrelevant to the charge, and the psychological evaluation was not a defense.

The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision ... to decide not to put certain witnesses on the stand ...."). Petitioner fails to overcome the strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance; the failure to call these witnesses was not constitutionally ineffective assistance of counsel. *See, e.g., Alcala*, 334 F.3d at 872–73; *Dows v. Wood*, 211 F.3d 480, 486 (2000) (finding that petitioner did not provide sufficient evidence of trial counsel's lack of preparation to prevail on an ineffective assistance claim where, *inter alia*, there was no evidence that the witness would have provided helpful testimony for the defense).

           3)   <u>Cumulative Error</u>

Petitioner's cumulative error argument is also without merit. A cumulative error

claim allows for habeas relief when, although no single error independently warrants reversal or rises to the level of a constitutional violation, the effect of multiple errors caused the petitioner to suffer undue prejudice. *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where ... there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors" in the trial). In this instance, as discussed above, eight of Petitioner's ineffective assistance of counsel claims[7] are based upon conclusory and unsupported allegations about the content and impact of the documentary evidence or witness testimony. Two of Petitioner's other claims[8] are based on evidence that is inadmissible. Based on this record, the Court concludes that this claim of cumulative error lacks merit.

## X.   **Ineffective Assistance of Appellate Counsel**

Petitioner also argues that appellate counsel was ineffective for failing to raise "multiple constitutional issues" on direct appeal. Doc. #1 at 56. Petitioner does not identify what these additional issues were, but in his traverse he argues that appellate counsel's failure to raise these issues on direct appeal constitutes cause to excuse any procedural default of the following claims raised in this habeas petition: insufficient evidence (claim 5), prosecutorial misconduct (claim 6), First Amendment free exercise of religion claim (claim 7), and Eighth Amendment claim (claim 8). Doc. #11-1 at 91. The Court therefore addresses whether appellate counsel's failure to raise claims 5, 6, 7, and 8

---

[7]These eight claims are that trial counsel was ineffective for failing to obtain and/or introduce into evidence transcripts from the Alameda County case; Hart's October 7, 2002 statement to Albany Police; the 2002 civil restraining order from Alameda County; Alameda County Inspector Corey White's investigative notes; Petitioner's probation file; the Albany Police compilation of and investigation into Hart's complaints against Petitioner in 2002; Citigroup's investigative records; and the testimony of the specified witnesses.

[8]These two claims are that trial counsel was ineffective for failing to obtain and/or introduce into evidence the CDCR RVR and CDCR Form 602.

constituted ineffective assistance of counsel.

### A.    Standard

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391–405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).  First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106.  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285–86; *Moormann*, 628 F.3d at 1106.  It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id.* at 1434.  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason – because he declined to raise a weak issue. *Id.*

### B.    Analysis

Petitioner alleges that he requested that appellate counsel raise the following issues: insufficient evidence, prosecutorial misconduct, First Amendment free exercise of religion claim, and Eighth Amendment cruel and unusual punishment claim.  Petitioner alleges that appellate counsel responded that appellate courts tended to look upon those

constitutional issues with disfavor and therefore refused to include these issues, instead advising Petitioner that it would be in his best interests to raise these issues in collateral proceedings.  Doc. #1 at 56.

The Court had addressed each of the above claims in this order and found these claims to be meritless; it therefore follows that his appellate counsel was not ineffective for failing to raise these issues on appeal.  *See Strickland*, 466 U.S. at 687–88 (requiring a showing of deficient performance as well as prejudice).  Moreover, this case's procedural history supports a finding that appellate counsel deliberately chose the strongest issues to include in the direct appeal.  On direct appeal, appellate counsel filed a 66-page brief, raising the following constitutional challenges to Petitioner's sentence: judicial misconduct, instructional error, sentencing error, and double jeopardy.  Docket #9, Exh. 6.  Appellate counsel was successful in part; the state appellate court granted Petitioner relief on his double jeopardy claim, and vacated his conviction on counts 1 through 3, agreeing that they were not separate offenses but rather alternate punishments for the single offense of stalking.  Given this context, appellate counsel's failure to raise claims 5, 6, 7, and 8 does not warrant federal habeas relief.  *See Miller*, 882 F.2d at 1434.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  June 1, 2012

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

MALIK ALI MUHAMMAD,

        Plaintiff,

  v.

MATTHEW M MARTEL et al,

        Defendant.
_____/

Case Number: CV09-04140 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on June 1, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Malik Ali Muhammad V-37398
California Rehabilitation Center CSP
P.O. Box 3535: 402-27 Low
Norco, CA 92860

Dated: June 1, 2012

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk